We'll now hear 22-5073 Grubb v. DXP Enterprises. Mr. Love. Good afternoon. My name is Jim Love. I'm representing William Grubb, the appellant. He's present in the courtroom today. I believe there are two reasons why this appeal should be granted. One is that the district court's order dismissing the case was perforated with lots of findings that Mr. Grubb knew or should have known certain things. In fact, there is no evidence that Mr. Grubb knew the things that were identified by the court. There was only evidence, at least arguments, that he should have known certain things. So I can use, for example, the fact that Mr. Grubb never received a K-1 from this partnership that was formed. And that's interesting, but Mr. Grubb also testified that he did not know what a K-1 was, and in any event, didn't understand it to have been a taxable event that would result in the dissemination of those forms. These are all should-have-known events. The court goes, and they should be tried in a jury. As far as I can tell in my own research, having done this for four years, should-have-known research or should-have-known issues go to a jury. I mean, you're jumping right to the statute of limitations issue, and you have to separate out claims because different tolling rules apply to fraud claims than contract claims. And you're talking about a partnership, and you have partnership claims that are both contract and fraud, so I'm having a little trouble following you. Well, it's interesting you bring that up. The application, for example, of Mr. Grubb's failure to receive a K-1 has multiple consequences. Number one, the court suggests that Mr. Grubb didn't understand he was in a partnership, which is an immaterial finding. It doesn't matter to me that he was in a partnership. Second, I understand that you're saying that the discovery rule wouldn't apply to the tort claims, and to what degree does Mr. Grubb's failure to appreciate non-receipt of a K-1 factor into the discovery rule? Well, the discovery rule doesn't apply to your contract claim. Correct. Okay. So you only can argue fraudulent concealment. Which we did. I understand. But it's a tougher standard than the discovery claim. Do you agree with that? Yes. My concern about your question is that the fraudulent concealment didn't have anything to do with K-1s. It had to do with dual financial books. And the failure of DXP to disclose to Mr. Grubb that monies that would have ordinarily been attributed to the partnership were in fact being diverted to other reporting units, leaving Mr. Grubb's sale right, right under the employment agreement, of no value. Don't you have a more substantial problem with your partnership claims? There was never any agreement to share profits here. And that you can't have an implied partnership without sharing of profits. I don't agree with that comment. And I don't see it as a substantial problem. 1-202 never mentions sharing profits. That is a common law announcement that has been completely displaced by RUPA and 1-202. Well, I guess I don't agree with you that it's been completely displaced by RUPA. So, we have a disagreement. The only change that the statute made was that it clarified that intent is irrelevant on implied partnership claims. It also says the new definition as of 1997 was that, and this is, you probably already read it, but 1-104 talks about unless displaced by particular provisions of the act, the principles of law and equity supplement this act. Okay. So, but they are taking the common law definition and displacing it. Common law had requirements like shared management, splitting profits, things like that. Those are nowhere to be found in 1-202. So, what, I mean, in your position, what does he have to do to prove that there was a partnership? Co-own a for-profit enterprise. Isn't that, I mean, that's conclusory. I co-own it. I'm just, I can read the statute to you. I don't want you to read me the statute. You've got to tell me what's there. You've got to satisfy the elements of the statute with evidence. Well, so co-ownership. He was assigned a 10% interest in the new company by a combination of agreements. One, the Smith communication that we talked about in our brief. And second, and then the referral back to the Smith communication in the employment agreement. And so when this new company is formed, in this case the partnership, he would, you say there's no split profits. There is an agreement, at least an implicit agreement, to split profits. He's got 10% of the company. Don't you think at some point he has to tell DPX, hey, I'm supposed to, DXB, I'm supposed to be getting my share of the money here, and I'm not getting it. He testified to that issue. If you look at Clause 11, it talks about a payout in a lump sum. His subjective belief based on that, on Clause 11, was that there would be an accounting at such time as he served his cerabrite notice, at which he would receive both the profits he had not received to date and the payment according to a formula for the bridge sale rate rights under the agreement. He testified that he thought he would receive profits. Yes, and what's more, let me finish this thought, Judge. No, I'm going to finish. You're in charge. You're right. That seems to undercut what I thought was your best argument on statute of limitations, which was that the cause of action had not accrued because the cause of action, what he's really complaining about is not getting the 10% interest he's entitled to when he leaves. If he knew that he was supposed to get profits, if he thought he was supposed to get profits all along, then the cause of action accrued as soon as he didn't get profits. Can you respond to that? Yes. At the time that he served his cerabrite notice, he also served a document that set out the accounting for all the years that he had been a partner in this new venture. So his state of mind is clear. He thought he was entitled to his 10% of the profits, and he served that notice at the same time as his cerabrite notice. Yes, but in the course of doing that, he's saying, I thought I was supposed to be getting profits all this time. How is that? You're saying, I didn't think I was supposed to get profits all this time, but now I'm asking for the profits from the prior X number of years? He never said he thought he should be getting profits all this time. What he said was, it's time to pay me my share of the profits as against the cost of this organization after these 10 years. But he thought, he is saying that he thought he was entitled to a share of the profits. At a particular point in time, yes. But if he's supposed to be getting a share of the profits, then is he saying I wasn't supposed to get it at the time they earned the profits? Correct. He says that? Yes. He says, I was supposed to get a share of the profits, but not until I ended my arrangement and also got my 10% of the profits. Correct. And the basis, whether you think it's justified or not, is that there is lump sum payment or lump sum reference in Clause 11. So he's not working with counsel. He's doing the best he can to interpret his own agreement. And so he serves these co-joining demands for payment in 2019. I've got the contract here. You said Clause 11 of the contract? Yes. I guess what's concerning me is you have a contract that says, it's our intention that immediately we're going to form a company, an LLC, and you're going to get 10% of it. And that never was done. And your client never said, hey, what's going on here? We're supposed to immediately form an LLC. Well, you know, the oil market has crashed, so we can't do it right now. And he never said, well, let's go ahead and do it and see where the business goes from there. And then as we go along, you know, I'm supposed to get profits, but we never ask for profits until the very end. And it just seems that there were lots of opportunities for your client to recognize that the deal wasn't being consummated as agreed and to squawk about it. And he never did until the very end. Well, let me jump in with my thoughts on that issue. During an early conference call in December of 2008, David Little, the CEO of DXP, instructed, it turns out it's his son-in-law, who's a VP of DXP, set up the new company in the DXP umbrella. Check that box. That's being done. I got my company. Well, he didn't have his company because there was no company. I mean, that's not what the agreement said. He didn't ever say, hey, I don't agree with that. I want it in writing. I want it just like we agreed on. Well, in writing would have been nice, but that statement led him to make certain conclusions, and he thought that was being done. And there were several other things that were going on, Joe, that convinced him that the company was forced. It got a name. It got a phone number. It turns out the HP Plus phone number was Bill Grubbs. And this is your constructive fraud claim, really, isn't it? Well, I'm trying to address Judge Carson's comments about why is he jumping in and being more proactive? What makes him think it was a real company here? I was going down that list of considerations. And so weekly conference calls started with not only the principals who were managing the new company but others, and they were planning, and there was two years of planning. And then vendors were identified, and then products began to be assembled at a different place, not Snyder like they originally talked about. Snyder was canceled not on the basis of not going forward with the company. They immediately capitalized the company. And that was another reason that Bill Grubbs thought that there was a real company that was capitalized. I put the number in my brief, a million eight or something. I don't remember the number, but a lot of money. This company is going forward. And the only thing that's missing is, wait a minute, I never got articles of incorporation. I never got a certificate from the Secretary of State. I never got a distribution. I never was asked to make decisions. Well, he was making decisions. That's interesting you bring that up. If you look at his employment agreement, look at Addendum A. It talks about the managerial responsibilities that he has. We put it in the brief. And those managerial responsibilities, again, Addendum A to the employment agreement, indicate that he is, and he was, in fact, in charge of the day-to-day operations of HP+. He managed all that from Tulsa. In fact, most of the vendors that HP Plus used were not in Texas. They were in the Tulsa area. So there is a company that's going forward. Pump assembly and planning started. Sales commenced. Now we're making millions of dollars a year. What do you mean there's no company? Of course there's a company, he says. And we're wrong as to the issue of fact that you go to a jury. He had lots of reasons to think there was a company. And it turns out that because he had— How long was it before he got the financials? He got financials all the time. He got them in the form of something called a hybrid report. And this goes to our fraud claim, the Tulsa statute of limitations. It turns out that DHP has another set of books called income statements that, unlike the hybrid report, show the deferment of HP Plus's income to other reporting units, which completely cratered his— But he got those, too, sometimes. No, well, you're talking about the income statements. He got the hybrids all the time. But he also got income statements. Not until—the first one he received was January 2018, and the first one that he actually reviewed was May of 2018. Well, then statute of limitations. None of those—I think there were only two statements. Neither of those statements indicate a deferment of income ordinarily attributable to HP Plus to other reporting units. So, no, he didn't have any idea until he filed suit and took discovery that this income was being deferred to other reporting units. Complete fraud. Let me go back to my question. Okay. Sorry. I'm looking—no, no, no. I wanted to hear all of this other stuff. I'm looking at Clause 11. I don't see any mention of profits in there. It's not profits. It's just talking about the original agreement of how you measure the 10% ownership interest. Give me a second, Judge. And it's not based on income. It's based on gross sales. Okay. If you go to Clause 3—we do it this way. Okay. If you go to Clause 3E, upon a contemporary instance of the creation of a new company, employee will receive an ownership interest in the new company in an amount equal to 10%, okay, of the total ownership interest of the new company, suggesting—I wonder what that 10% is for. Surely I get some benefit from that, maybe like 10% of the profits. It's certainly a reasonable reading. No, I think it's reasonable to read what that 10% is is referenced in Clause 11, Paragraph 11. This is what he gets out of it. It's a lot of money. The formula for paying a salary in order to bind back his interest in the new company, okay? Let me read for a minute. I should have highlighted this. Your time has expired, so be quick. I didn't see that. So just be quick. Well, I don't want to eat the rest of my time on that point, but somewhere in there— That's the only time you have left. You don't have any more time. I don't have any more time. Oh, that's red, okay. Did you have any questions? No, there is a reference in here to you received a lump sum payment. Did you? No. Which he took to mean a payment of everything. It was his subjective belief. Thank you for your consideration. Thank you. And I appreciate your time. Boy, that went by fast. Time flies when you're having fun. Mr. Dove? Boy, I could make puns about counsel— Love and love. Don't, don't. Thank you, Your Honor. May it please the Court, Chris Dove on behalf of DXP. Let me tell you how I looked at this case before we got here today. I'm not sure it's still relevant. But it looked like the employment agreement could be understood in the following way. That it provides various elements of employment. But then he gets what they call a 10% ownership interest. It's not clear what that means because there's nothing about profits or things like that. He's getting a good salary anyway and there are bonuses also. And that the 10% just means he's entitled to what's in paragraph 11 when he leaves. And whether this company that's to be formed is a corporation, a partnership, anything, is not of much consequence except to the extent that it is a way to abbreviate, perhaps, what he's entitled to when he leaves. And there's no reason for him to worry about the formalities. They don't say what sort of formality you're going to have for this company. It's going to have ownership units. So he really doesn't have a cause of action. He has nothing to complain about until he leaves. And then he's entitled to an amount set forth in paragraph 11. And when he talks to the people in the company, they say, okay, we'll get back to you, da-da-da. And he gives them a little bit of a hard time. And then they say, hey, you're not entitled to nothing. And that is a question of whether that is performing the contract in good faith and fair dealing. Because it doesn't look very good faith to me to say, well, we didn't form the company, and we, in our discretion, decide not to form the company, so you're totally out. But that does not comport with my understanding of good faith and fair dealing in complying with the contract. So that's how I saw it. I'm not sure that that's a legitimate way to look at it. After what Mr. Cope's counsel said today, how do you respond to what I just said? Thank you for your thoughts, Judge Hartz. And I appreciate you laying the cards on the table. And I have to be honest with you. The first time I saw this case, I found myself kicking around similar questions. Doesn't this man think that he had something? And the answer to it requires me to situate his arguments in time. And I promise I'm answering your question by pointing out he's had three different theories of this case. The third he came up with for the first time in his reply brief in this court. What you're talking about is his first theory. The idea that the employment agreement that I signed required you to create a company, and you didn't do it. And so, therefore, that's a breach of contract. Mr. Grubb waived that argument in his reply brief on page two when he said, now, it clearly doesn't say—he didn't say the word clearly. He said, it doesn't say that in the employment agreement, it says it in an earlier email. That's what it's on page two. He has to make that concession for the reasons the district court found. The document itself does not create an entity. It's not a matter of when it accrues. It's not a matter of saying, I've got something, and then you're going to be paid out at the end. What the district judge rightly noted is that when you go looking for evidence that this entity exists or that there is a duty to create it at all, not as you had said, well, we'll worry about the formalities later. The formalities are everything here. There's a statement, we intend to create a company, and there's a statement that upon and contemporaneous with the creation of the company, we'll get 10% of the units. Let me interrupt. I mean, everyone formed this contract with the understanding that Mr. Grubb was only interested if he could get 10% of the new company, and he participated in a telephone conversation where it was reported that the company is going to be formed by, I guess, in-house counsel. I disagree with that. I don't think the record supports that. What it supports is, and I'm sorry I interrupted you. You did interrupt me. I apologize. Let's just say there is evidence from which the trier fact could find that he participated in a conversation where counsel was instructed to set up said company. In my view, he has pled a constructive fraud case because at the point that DXP decided, no, we're not going to do the company, they had an affirmative duty to let him know that this thing that everybody understood was critical to him in entering into this agreement wasn't going to happen. And they didn't do that. I think they had a good faith and fair dealing obligation to say, just so you know, I don't want you working here for 10 years thinking at the end you're going to get all this money because we're not doing it. We've changed. We're not going to form this company. That's not what happened. And at the end, when he first makes his request, DXP doesn't understand they don't have an obligation to pay him out. It isn't until they go talk to their lawyers that they come back and say, guess what, you're getting nothing. I mean, I agree with Judge Hartz. It doesn't look very good for DXP here. You can talk. I'll let you. You now can interrupt. Thank you, Judge. My answer to that is that all of that argument, all of this line of argument necessarily assumes that DXP has the obligation to create this entity. There is no fraud if they don't say I'm not creating an entity and they had no obligation to create it in the first place. Yes, there is. That's what constructive fraud is. It's when you have a duty to speak based on the dealings with the party and the good faith and fair dealing. And so if you enter into this contract and everybody expects we're immediately going to set up this company and you can't even read the contract provisions without understanding about this new company because it says new company, new company, new company. If you decide internally, you know what, we're not going to do that. And even though it's a huge difference in compensation to this other party and we're not going to tell him either. Let me interrupt you. You can interrupt me. I need your permission to interrupt you. I'm not sure about constructive fraud. That may be work, but it seems like it's classic acting in good faith and fair dealing. They've got something they can do or not do. If they don't do it, if they don't form a company, they haven't breached the contract per se. But in exercising their discretion about whether or not to form a company, they have to act in good faith towards the other party to make sure the party does not lose the benefit of the contract. It's the quintessential type of claim of good faith and fair dealing. I will pay you for that piece of art unless I don't like it. And the person actually likes it, but just says, you know, I don't have the money now. I don't want to spend it on that. I'd rather buy a yacht than the art. Then you've got a good faith or fair dealing issue here. Okay, now you've got two theories here. Fortunately, my answer to both is the same. They are two different ways of expressing something that fails for the same reason. So I understand why you're expressing it. As we briefed in our response brief, the duty of good faith and fair dealing, Oklahoma has now explained, it only applies to things that you have to do under the contract. It doesn't rewrite the contract. It's not some extra contractual duty. They firmly rejected that. And good faith and fair dealing only applies to contracts of adhesion and to insurance contracts. Which this wasn't because Mr. Grubb wrote this contract. But what you're getting at is the idea, if you said you were going to do this, you had to do it. And what I understand from constructive fraud is, having said you were going to do that and then not doing it, you have to speak up and say something different. And the reason why that doesn't work. That's why I like constructive fraud and not copyright. The reason why is because I only have to speak and say I'm not doing it if I promised to do it. That's new information that I have to disclose to you. And if you look at this contract, as the district court did, and say, find in here where it says I have to create it, and it doesn't happen. What happened was the parties were in the middle of a negotiation and they agreed to agree. And Mr. Grubb wrote this agreement. He said, this is what I want with the help of my lawyer. And he now has to stand on the problem that is faced by everyone that agrees to agree. They kept negotiating and they reached a point where they said, here's what we're going to do. We're not going to build a new facility in Schneider. We're going to go ahead and start setting this up under the DHD. And that had nothing to do with whether or not they form a company. I agree. Different issue. Go ahead. Do you want to address that point? Because apparently two of us don't think that the fact that they weren't going to build a facility doesn't mean they weren't going to have a separate company. Well, then I'll move to the next point. Take a hint. You can change your mind. That's possible if you want to try. All I can urge you to do is to say, where does it say we have to form a company in this agreement? If you can find where it says you must do it and not that it is something we anticipate doing in the future, which is not enforceable. Maybe it's contrary to Oklahoma law, as you say, but my understanding of good faith and fair dealing is you can decide not to form a company. You just can't do it in bad faith as a means of preventing the opposing party from getting the benefit of the contract. That's the issue. Otherwise, it's fine. You don't have an obligation to do it. You just can't refuse for a bad faith reason. And where I disagree with that analysis, and as we briefed in our response group, the reason why that doesn't work is it still has to be an obligation founded in the contract itself. It cannot be extracontracted. And this contract does not say I have to form an agreement. But let me move on, then, with the time I have remaining. He then runs into a tremendous statute of limitations problem. Because even if the allegation is you should have said something in 2009 when this happened, the problem is he filed suit in 2019. His claim accrued far before limitations in this case. Because, as the district court aptly noted, in all of that time, you would have had to receive something, anything, to show you that there was a company created. And Mr. Love says, well, he didn't know what a K-1 was. His problem is that he received nothing. Not a single document. He didn't tell anyone he had a partnership or a separate agreement. He watched VXP file for trademarks under its own name. He watched it advertise this as a 100% VXP-owned pump. He wrote those words. He went on down the road knowing full well that he had never received any indication. And he himself had not said to anyone, I have this right. And so, by the time he gets to 2019, makes this demand, and I want to be very clear what the record says about what happened. He said, I want this demand. The CEO said, demand for payment? All right, I'll look at it. I'll get back to you. He comes back and says, I looked at this. I don't think I owe you anything, but let's talk. And let's take it as Mr. Grubb describes this in his deposition, what happened. Let's talk, Mr. Grubb says. He said, my offer is going to be a significant amount of money. He said between $300,000 and $600,000, but it will be based on the pump. And you want profits for based on all of the other things that you didn't bring to this company. When we were then waiting to make an offer to him, Mr. Grubb shut it down by suing us. That's what happened next. We were in the middle of negotiations. So I want to make sure that the record is what was reflected here. And one final point I would like to make in the time I have left. No, I'm going to ask the question. Then you can make the point. I'll give you time. Your statute of limitations argument, though, doesn't work if there's a good faith claim, because the bad faith wasn't shown until the negotiations or when he's leaving and he's not getting his money. That's the bad faith. And that cause of action would accrue. You may be right that there's no cause of action for various reasons. But that's when the bad faith claim would accrue. It only accrues if Section 11 were some sort of creative company or payout provision. What it is is a right to buy out units he already owns. If he has reason to know for 10 years he doesn't own any units, because there's not one scrap of evidence he ever got notice of that, that means the claim accrued many, many years earlier. And this last point I'd like to make, because this is the only time I have in order to make this point to this court. Mr. Grubb made an entirely new argument in his reply brief, and I want to make sure it doesn't somehow work its way into this court's opinion. He argues, for the very first time, that it was not the employment agreement that created the duty, and that it was not the employment agreement that created the partnership agreement. It was a prior email sent on October 24th. That contradicts everything that he argued in the trial court. I can read to you many, many citations from the record. In his complaint, in his pleadings, Mr. Grubb said nine times in his deposition, what created the partnership was the partnership agreement. We're very strict about not allowing new arguments. Very good. So by alerting us to that, you've performed your duty. Thank you. Then my time is over. Yes, it is. Not that much, and I think you went over a little bit, too, so I don't think there's need to give additional time to the felon in this circumstance. Unless somebody has a question. Good. Thank you all. Interesting argument. Case is admitted. Counselor excused. Court will be in recess.